THE EVANSVILLE COURIER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29418. Promulgated June 25, 1931.

*John E. McClure, Esq.*, for the petitioner.
*James L. Backstrom, Esq.*, for the respondent.

OPINION.

LOVE: The first issue is whether petitioner's income for the 11-month period ending December 31, 1920, is overstated in the amount of $15,000.

Petitioner contends that the provision in its bill of sale from Marshall wherein it is recited that Marshall "hereby pays" to petitioner $15,000 in cash "to cover the unearned part of prepaid newspaper subscriptions" clearly shows that the $15,000 was nothing more than a reduction in the purchase price of the property and assets from Marshall, and that both petitioner and respondent were in error in treating the $15,000 as income. Petitioner, therefore, prays that its net income as determined by the respondent for the period in 1920 be reduced by the amount of $15,000.

The respondent's position is that, while it may be true that when petitioner paid $99,600 in cash as part consideration for the property and assets and received as a part of such property and assets $15,000 in cash, the net result was the same as if it had only paid $84,600 in cash, yet it assumed a liability to either furnish a newspaper to those subscribers who had paid their subscriptions in advance or to refund their prepaid subscriptions, and that the liquidation of such liability was not deductible as a business expense. In other words, the respondent contends that if the gross income as reported by petitioner and as determined by him is to be reduced by $15,000, then an equal amount of expenses should be disallowed, in which event the net income would and should remain the same as determined in the deficiency notice.

We are of the opinion that the contention of the respondent upon this point is sound and should be sustained. In its return petitioner claims the deduction from gross income of all of its ordinary and necessary operation expenses. In the determination of the deficiency the respondent has not disallowed any portion of the amount which the petitioner may have paid in fulfilling its liability to the subscribers who had paid their subscriptions to the former owner of the paper. The former owner turned over to petitioner $15,000 of the subscriptions which it had received, an amount which presumably was to recompense the petitioner for assuming the obligation of the predecessor owner with respect to the prepaid subscriptions. We are of the opinion that the $15,000 represents income to the petitioner to the same extent as though the subscribers themselves had paid that amount of money to the petitioner, and that if that $15,000 was to be excluded from the gross income of petitioner, an equal amount should be disallowed from the deductions which had been allowed petitioner in the computation of the deficiency. In our opinion the contentions of petitioner upon this point are without merit and they are not sustained.

The second issue is whether, at the time of organization, a part of petitioner's intangible assets (circulation, Associated Press membership and good will) should be considered as having been acquired

for cash instead of capital stock. The facts are that petitioner acquired a mixture of tangible ($169,231.73) and intangible ($449,-989.03) assets (total $619,220.76) in consideration for the following:

| | |
|---|---|
| Capital stock | $500,000.00 |
| Cash | 84,600.00 |
| Liabilities assumed | 34,620.76 |
| Total | 619,220.76 |

Petitioner concedes that the assumed liabilities are to be charged against the tangible assets as is provided for in article 835 of respondent's Regulations 45 and 62. See also *Pennsylvania Central Brewing Co.*, 9 B. T. A. 264, wherein we held that, where a mixture of tangible ($1,505,684.83) and intangible ($2,202,415.20) assets were acquired for $2,800,000 par value of bonds and $5,600,000 par value of stock, " the bonds were issued first for tangibles; that the bonds in excess of the tangibles were issued for intangibles, and that the remainder of the intangibles were acquired for stock."

The respondent, in his determination, also treated the cash as if it had been paid for the tangibles. It is at this point that petitioner contends the respondent erred. Petitioner contends that there is no more justification for saying that the cash was paid for the tangibles than to say it was paid for the intangibles. In fact, petitioner argues very strongly that in a newspaper business the intangibles are considered as more important to the success of the enterprise than are the tangibles, and that, if anything, the cash ought to be considered as having been paid for the intangibles rather than the tangibles. But petitioner is not pressing its contention that far. Its position here is that, in the absence of evidence to the contrary, the cash and capital stock should be allocated to the tangible and intangible assets according to their cash value at the time paid in, which would be as follows:

| Assets | Amount | Acquired for cash | Acquired for stock |
|---|---|---|---|
| Tangible | $134,610.97 | $19,480.14 | $115,130.83 |
| Intangible | 449,989.03 | 65,119.86 | 384,869.17 |
| Total | 584,600.00 | 84,600.00 | 500,000.00 |

The contention advanced by petitioner finds its root in the limitations Congress placed on the amount of intangible assets acquired for stock that could be included in a taxpayer's statutory invested capital. See section 326 (a) (4) and (5) of the Revenue Acts of 1918 and 1921. Were it not for these limitations it would make no difference whether the $84,600 was paid for tangibles or intangibles,

for the reason that the $84,600 was borrowed capital, and, as such, was specifically excluded from invested capital by section 326 (b) of the Revenue Acts of 1918 and 1921. To illustrate, if the $84,600 were paid for tangible assets, it would follow that the $500,000 of capital stock was issued for $50,010.97 of tangibles and $449,989.03 of intangibles. Under section 326 (a) (5), *supra*, only $125,100 of the intangibles may be included in the statutory invested capital, which, with the $50,010.97 of tangibles and the $400 of stock issued for cash, makes up the $175,510.97 invested capital determined by the respondent for the full year. On the other hand, if $19,480.14 of the $84,600 were paid for tangibles and $65,119.86 for intangibles, it would follow that the $500,000 of capital stock was issued for $115,130.83 of tangibles and $384,869.17 of intangibles, and, since the latter amount was still in excess of the limitation, petitioner's statutory invested capital would be $65,119.86 larger than that determined by the respondent, or $240,630.83, computed as follows:

| | |
|---|---:|
| Net tangible assets | $115,130.83 |
| Intangible assets | 384,869.17 |
| Stock issued for cash | 400.00 |
| Capital stock issued | 500,400.00 |

Less adjustment for intangibles:

| | | |
|---|---:|---:|
| Intangibles for stock | $384,869.17 | |
| 25% of capital stock | 125,100.00 | |
| Intangibles excluded | | 259,769.17 |
| Invested capital for full year | | 240,630.83 |

In support of its contention, petitioner cites and relies upon our decision in *St. Louis Screw Co.*, 2 B. T. A. 649. In that case the facts were that the taxpayer acquired tangible and intangible assets in exchange for stock and the assumption of certain liabilities. We there held that the value of the tangibles should be reduced by the amount of the liabilities; that the capital stock should be applied against the remaining tangibles and intangibles, according to the cash value of each class of assets at the date of acquisition; that the excess of the cash value of tangibles over the par value of the capital stock allocated to the tangibles constituted paid-in surplus; and that the intangibles so paid in for stock should be included in invested capital subject to the 25 per cent limitation contained in the statute. The principle there established has been applied in *Mandel Bros.*, 4 B. T. A. 341, 347; *Tyler & Hippach, Inc.*, 6 B. T. A. 636, 640; *Mossman, Yarnelle & Co.*, 9 B. T. A. 45, 53; *Corning Glass Works*, 9 B. T. A. 771, 787; *D. N. & E. Walter & Co. et al.*, 10 B. T. A. 620, 628; and *Steele, Wedeles Co.*, 11 B. T. A. 279. Petitioner argues in its brief that the sole difference between its contention in the instant case and the principle established by the Board in the *St.*

*Louis Screw Co.* case is the fact that petitioner paid cash in addition to issuing stock. It overlooks, however, the fact that the liabilities assumed in the *St. Louis Screw Co.* case were applied first against the tangible assets.

The respondent in his brief relies upon and quotes at length from our decision in *Pennsylvania Central Brewing Co.*, *supra*. As stated above, the taxpayer in the latter case issued its own stock and bonds for a mixture of tangible and intangible assets. The only difference in the instant case is that in place of issuing stock and bonds, petitioner issued stock and paid cash which it had previously borrowed. If it had given its note to Marshall instead of to the banks for the sum paid to Marshall, the two cases would be identical. The distinction between the two cases is not one that requires the application of a different rule. Furthermore, the facts in the instant case are, for all practical purposes, parallel with the facts in *Pharos-Reporter Publishing Co.*, 1 B. T. A. 879. The petitioner in that case acquired *a newspaper* business from a partnership of two individuals. In doing so it acquired a mixture of tangible and intangible assets and in exchange therefor issued $15,000 of stock to one partner and paid $15,000 in *cash* to the other partner. Petitioner there contended that since it had actually paid $15,000 in cash to one of the partners, at least one-half of its intangibles should be considered as having been acquired for cash. We denied the contention and held that the cash should be treated as having been paid for the tangibles. The same rule should be applied in the instant case. We, therefore, approve the respondent's determination as to this issue.

The third issue is whether petitioner comes within the provisions of sections 327 and 328 of the Revenue Acts of 1918 and 1921. We have found that petitioner had a commercial invested capital of $500,400, consisting of net tangible assets of $50,410.97, and intangibles of $449,989.03, and that by the proper application of section 326 (a) (5), *supra*, only $125,100 of such intangible assets could be included in its statutory invested capital. A taxpayer is not entitled to have its profits taxes computed under the special assessment provisions of the statute because a part of its commercial invested capital is not recognized as a part of its statutory invested capital. *Morris & Co.*, 1 B. T. A. 704. The exclusion must be such as to create an abnormal condition. *J. H. Guild Co.*, 11 B. T. A. 914; *Clarence Whitman & Sons, Inc.*, 11 B. T. A. 1192; *Detroit Opera House, Inc.*, 13 B. T. A. 587; *Thomas B. Moreland Co.*, 16 B. T. A. 858; *Marc Eidlitz & Son, Inc.*, 18 B. T. A. 187; and *William Wilson Co.*, 18 B. T. A. 1107. In the instant case the assets excluded were the most substantial part of petitioner's capital and the prin-

cipal contributing factor in the production of taxable income, which, in our opinion, brings it within the scope of the special assessment provisions of the statute.

*Further proceedings will be had under Rule 62 (c).*